Howard Shanker
The Shanker Law Firm, PLC
700 East Baseline Road
Building B
Tempe, Arizona 85283
Telephone: (480) 838-9300
Fax: (480) 838-9433
howard@shankerlaw.net

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY;** and <br><br> **MARICOPA AUDUBON SOCIETY,** <br><br> **Plaintiffs,** <br><br> v. <br><br> **KENNETH SALAZAR**, Secretary of the Interior, <br> U.S. Department of the Interior; and <br><br> **ROWAND W. GOULD**, Acting Director, U.S. Fish and Wildlife Service, <br><br> **Defendants**. | **Civil Action No.:** <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     On December 28, 1973, President Richard M. Nixon signed the Endangered Species Act ("ESA") stating that "Nothing is more priceless and more worthy of preservation than the rich array of animal life with which our country has been blessed."

2.    Thirty-three years later, the bald eagle exemplifies the ESA's success. Once faced with extinction due to DDT and other threats, today bald eagles thrive in many parts of the country.

3.    Unfortunately, the Sonoran Desert population of bald eagles ("desert eagle") has failed to achieve the recovery success that other bald eagle populations have achieved.  Described as the "Treasure of the Southwest," desert eagles are still on the brink of extinction.  Isolated reproductively, biologically, behaviorally and geographically from all other bald eagles, today only approximately 52 breeding pairs of desert eagles are known to exist.  Significantly, the productivity (breeding success) of existing breeding pairs has declined. Current population viability data from the Arizona Game and Fish Department show that they will likely go extinct in approximately 75 years.

4.    In anticipation of just such a scenario as exists in this case, where a discrete, imperiled population of a species requires greater protection or more time to recover than the species' remaining members, Congress amended the ESA to define the term "species" as including "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  ESA § 3(16), 16 U.S.C. § 1532(16). This definition extends the ESA's safeguards to imperiled populations of vertebrate species, even in cases where the remainder of a particular species is not threatened or endangered.

5.    Indeed, Congress amended the ESA's definition of "species" to include "distinct population segments" ("DPS") with bald eagles in mind.  When bald eagle populations in the contiguous 48 states were on the verge of extinction, bald eagle populations in Alaska and Canada were considered stable.  The expanded definition of a species allowed the eagles in the contiguous 48 states to receive ESA protections despite the fact that the species as a whole (due to the Canadian and Alaskan populations) was not threatened with extinction.  In other words, Congress recognized that it was not

enough to have bald eagles in Alaska; the populations in the contiguous 48 states mattered as well.  See e.g. S. Rep. No. 96-151, at 7 (1979).

6.     The desert eagle faces the same situation.  While most bald eagle populations have successfully recovered, the desert eagle population has yet to overcome significant obstacles on its own road to recovery.  Without continued ESA protections, particularly habitat protection, desert eagles will likely go extinct.

7.     In order to prevent the desert eagle (*Haliaeetus leucocephalus*) from going extinct, the Center for Biological Diversity and Maricopa Audubon Society (collectively "the Center") petitioned the U.S. Fish and Wildlife Service ("FWS" or "the Service") to list the species as endangered pursuant to the Endangered Species Act ("ESA").  ESA §§ 2-18, 16 U.S.C. §§ 1531-1544.

8.     On August 30, 2006, however, despite the well-documented scientific information demonstrating the reproductive isolation and unique characteristics of the desert eagle, and despite the fact that for more than three decades now, the desert eagle has been described as a "unique" population by both independent scientists and the Service, FWS reversed course and declared that desert eagles are not "significant" and thus do not qualify for listing consideration as a DPS.

9.     In addition, despite acknowledging that the Center's Petition detailed numerous threats to desert eagles and their habitat, and despite population viability studies concluding that desert eagles may become extinct within a few decades, FWS nonetheless concluded that Plaintiffs' Petition "does not provide substantial scientific or commercial information indicating that [listing of the desert eagle] may be warranted." The Service also determined that desert eagles are not in danger of becoming extinct in the foreseeable future despite the fact that the Service has never explained what constitutes adequate population numbers for this population of bald eagles.

10.     On March 6, 2008, this Court issued an order declaring the Service's 90-day finding to be arbitrary and capricious, expressing "no confidence" in the objectivity of the agency's decision-making process.  This Court enjoined the application of the

final delisting rule until the Service conducts a lawful determination on the desert eagle listing status as a DPS, and remanded to the Service to commence a 12-month status review. *Center for Biological Diversity v. Kempthorne*, No. CV 07-0038-PHX-MHM, slip op. at 11, 2008 WL 659822 (D. Ariz. Mar. 6, 2008) (hereinafter *CBD v. Kempthorne*).

11.     After requesting several extensions of time to complete its status review, FWS published its 12-month finding in the Federal Register on February 25, 2010, reaching the same conclusion the agency made in response to the Center's initial listing petition and later overturned by this Court – namely that desert eagles are not "significant" to the overall bald eagle population and thus do not qualify as a DPS eligible for protection under the ESA. Upon concluding its status review and issuing its 12-month finding, the Service moved this court to dissolve the injunction enjoining the application of the final bald eagle delisting rule. Doc. 82.  The Center opposed the Service's Motion to Dissolve and brought a Cross-Motion to file a supplemental complaint. Doc. 88. On September 30, 2010, the court ruled in favor of the Service, dissolving its injunction and denying the Center's motion to supplement its complaint. Doc. 130 at 11.  The court also ordered any new action challenging the 12-month finding to be assigned to Hon. Mary H. Murguia in order to serve the purposes of judicial economy. *Id*. This action seeks declaratory and injunctive relief overturning the Service's negative 12-month finding for the desert eagle DPS and compelling the Service to immediately begin a new, lawful status review.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a defendant), 16 U.S.C. §§ 1540(c) & (g) (action arising under the Endangered Species Act and citizen suit provision), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

13.     This Court has authority to grant the requested relief pursuant to 28 U.S.C.

§§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

14.     As required by the Endangered Species Act ("ESA"), the Center provided the Secretary with written notice of intent to sue more than 60 days ago.  ESA § 11(g)(2), 16 U.S.C. § 1540(g)(2).  Because the Secretary has not remedied the violations of law, there exists an actual controversy between the parties within the meaning of the Declaratory Judgment Act.  28 U.S.C. § 2201.

15.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e) and ESA § 11(g)(3)(A), 16 U.S.C. § 1540(g)(3)(A).  The desert eagle lives in this judicial district, a substantial part of the events giving rise to the cause of action occurred in this judicial district, and defendants maintain an office in this judicial district.

## PARTIES

16.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit corporation with over 25,000 members and offices in San Diego, Joshua Tree, Los Angeles, and San Francisco, California; Washington, D.C.; Portland, Oregon; Tucson and Phoenix, Arizona; and Silver City, New Mexico.  The Center is dedicated to the preservation, protection, and restoration of biodiversity, native species, ecosystems, and public lands.  The Center's members and/or staff use and enjoy, and intend to continue to use and enjoy, lands where the desert eagle is found for observation, research, aesthetic enjoyment, and other recreational, scientific, and educational activities.  The Center's members and/or staff have researched, studied, and observed the desert eagle and intend to research, study, and observe the species in the future.  Defendants' ESA violations facilitate the decline of this species and its habitat.  Therefore, the Center's members and/or staff's educational, scientific, aesthetic, spiritual, professional, and conservation interests are being adversely affected and irreparably injured by the Service's continued violations of the Endangered Species Act.

1  The Center brings this suit on its own behalf and on behalf of its adversely affected
2  members and staff.

3      17.    Plaintiff MARICOPA AUDUBON SOCIETY ("MAS") is a non-profit
4  organization dedicated to the enjoyment of birds and other wildlife with a primary focus
5  on the protection and restoration of the habitat of the Southwest through fellowship,
6  education and community involvement. MAS is a chapter of the National Audubon
7  Society. MAS has over 2300 members, primarily in central Arizona. MAS, a co-
8  petitioner for ESA listing of the desert eagle, has undertaken continuous ongoing activist
9  efforts to protect eagle habitats of the arid Southwest. MAS has played a strong role in
10 protecting endangered species in the Southwest through public education efforts, field
11 surveys, public field trips, and, position papers. MAS leads field trips with members and
12 non-members of the public to habitat areas of the desert eagle. MAS brings this action
13 on behalf of itself and its adversely affected members. Defendants' ESA violations
14 facilitate the decline of this species and its habitat. Accordingly, the educational,
15 scientific, aesthetic, conservation and recreational interests of MAS's members and staff
16 have been, are being, and unless the Court grants the requested relief, will continue to be
17 adversely affected and irreparably injured by Defendants' inaction and failure to comply
18 with the law.

19     18.    Defendant KENNETH SALAZAR is the Secretary of the Interior
20 ("Secretary"). The Secretary is the federal official charged with listing species as
21 endangered or threatened under the ESA. She is sued in her official capacity. The
22 Secretary has delegated his obligation to review listing petitions under the ESA to the
23 U.S. Fish and Wildlife Service.

24     19.    Defendant ROWAN W. GOULD is the Acting Director of the U.S. Fish
25 and Wildlife Service ("the Service") and has been delegated responsibility for
26 implementing the ESA including proposed and final listing and critical habitat decisions
27 and the handling of petitions for such listings.

28

# THE ENDANGERED SPECIES ACT

20.     The ESA is a federal statute designed to conserve endangered and threatened species and the ecosystems upon which those species depend.  ESA § 2(b), 16 U.S.C. § 1531(b).

21.     To achieve these objectives, the Service is required to protect such imperiled species by listing them as either "threatened" or "endangered" if they are facing extinction due to any one, or any combination of, the following factors:

(A)     the present or threatened destruction, modification, or curtailment of its habitat or range;

(B)     over-utilization for commercial, recreational, scientific, or educational purposes;

(C)     disease or predation;

(D)     the inadequacy of existing regulatory mechanisms; or

(E)     other natural or manmade factors affecting its continued existence.

ESA § 4(a)(1), 16 U.S.C. § 1533(a)(1).

22.     A species is "endangered" if it is "in danger of extinction throughout all or a significant portion of its range."  ESA § 3(6), 16 U.S.C. § 1532(6).  A species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  ESA § 3(20), 16 U.S.C. § 1532(20).

23.     Under the ESA, a species is explicitly defined to include "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature." ESA § 3(16), 16 U.S.C. § 1532(16) (emphasis added).

24.     Three elements are considered by FWS in a decision regarding the status of a possible distinct population segment ("DPS") as endangered or threatened under the Act: discreteness of the population segment in relation to the remainder of the species to

which it belongs; the significance of the population segment to the species to which it belongs; and the population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?).  See Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4722 (February 7, 1996).

25.   A population segment of a vertebrate species may be considered discrete if it satisfies either one of the following conditions:  it is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors (quantitative measures of genetic or morphological discontinuity may provide evidence of this separation); or it is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.  Id.

26.   A population segment of a vertebrate species may be considered significant if it satisfies any of the following:  persistence of the discrete population segment in an ecological setting unusual or unique for the taxon; evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon; evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range; evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics; or other evidence of significance ("because precise circumstances are likely to vary considerably from case to case, it is not possible to describe prospectively all the classes of information that might bear on the biological and ecological importance of a discrete population segment").  Id.

27.   If a population segment is discrete and significant (i.e., it is a distinct population segment), its evaluation for endangered or threatened status will be based on

1  the ESA's definitions of those terms and a review of the factors enumerated in section

2  4(a) of the ESA.  Id.

3      28.    A species receives mandatory substantive protections under the

4  Endangered Species Act if and only if it is listed as endangered or threatened.  Thus, the

5  listing process is the essential first step in the ESA's system of species protection and

6  recovery.

7      29.    Any interested person can begin the listing process by filing a petition to

8  list a species with the Secretary.  ESA § 4(b)(3)(A), 16 U.S.C. § 1533(b)(3)(A); 50

9  C.F.R. § 424.14(a)(2005).

10      30.    Upon receipt of a petition to list a species, the Secretary has 90 days to the

11  maximum extent practicable to make a finding as to whether the petition "presents

12  substantial scientific or commercial information indicating that the petitioned action may

13  be warranted."  ESA § 4(b)(3)(A), 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1).

14  This determination is known as a 90-day finding.

15      31.    If the Secretary makes a positive 90-day finding, he must promptly publish

16  it in the Federal Register and commence a "status review" of the species.  ESA §

17  4(b)(3)(A), 16 U.S.C. § 1533(b)(3)(A).  A status review enables the agency to do a

18  complete assessment of the status of a species, with input from interested members of the

19  public and the scientific community, and determine whether a population qualifies as a

20  DPS and whether it is facing extinction.

21      32.    After issuing a positive 90-day finding, the Secretary has 12 months from

22  the date that he received the petition to make one of three findings: (1) the petitioned

23  action is not warranted; (2) the petitioned action is warranted; or (3) the petitioned action

24  is warranted but presently precluded by work on other pending proposals for listing

25  species of higher priority.  ESA § 4(b)(3)(B), 16 § 1533(b)(3)(B); 50 C.F.R. §

26  424.14(b)(3).

27      33.    If the Secretary finds that listing the species is warranted, he must publish a

28

1   proposed rule to list the species as endangered or threatened in the Federal Register.

2   ESA § 4(b)(5), 16 U.S.C. § 1533(b)(5).

3        34.     Within one year of the publication of a proposed rule to list a species, the

4   Secretary must make a final decision on the proposal.  ESA § 4(b)(6)(A), 16 U.S.C. §

5   1533(b)(6)(A).

6        35.     Along with a final listing determination, the Service must issue a final

7   decision regarding the designation of critical habitat for the species to the maximum

8   extent prudent and determinable.  ESA § 4(a)(3) & ESA § 4(b)(6)(C), 16 U.S.C. §§

9   1533(a)(3) & 1533(b)(6)(C).

10

11   **THE DESERT EAGLE**

12        36.     The desert eagle distinguishes itself from other bald eagle populations in

13   several important respects:  1) it persists in a unique desert ecological setting (the

14   Sonoran Desert riparian areas of central Arizona and northwestern Mexico); 2) it is a

15   peripheral population that lives on the edge of the bald eagle's range; 3) it is smaller than

16   other bald eagles; 4) it possesses behavioral distinctions such as cliff nesting and early

17   season breeding; and 5) it is reproductively isolated, and likely genetically distinct, from

18   other bald eagle populations.

19        37.     The desert eagle population has been considered "unique" for over 30

20   years.  The Service itself has pointed out that "this population occupies a southwest

21   desert habitat not found elsewhere and utilizes nest sites unique to the species in the

22   contiguous United States."  See e.g. Nomination for Critical Habitat Determination –

23   Bald Eagle Nesting in Southwestern United States, Memorandum to: Director, USFWS,

24   Washington, D.C. (OES); From: Regional Director, Region 2 (SE); September 7, 1978.

25        38.     Moreover, as the Service has likewise stated, "20 years of monitoring have

26   resulted in the determination that no eagles have immigrated to and only one eagle has

27   emigrated from the [desert] bald eagle population."  See Petition to List the Sonoran

28   Desert Population of the Bald Eagle as a Distinct Population Segment, List that Distinct

1  Population Segment as Endangered, and Designate Critical Habitat, 71 Fed. Reg. 51549,

2  51554 (August 30, 2006).

3      39.    In fact, the desert eagle is so behaviorally distinct and reproductively

4  isolated that "should [its] population experience a rapid decline, there are few eagles in

5  neighboring southwestern states or Mexico which could serve as a source population,"

6  and "a decision to release [bald eagles] into Arizona from elsewhere should be

7  considered only as a last resort, as the introduction of foreign genes…might disrupt co-

8  adapted gene complexes specific to the [desert eagle]." 71 Fed. Reg. at 51553.

9      40.    While the estimated desert eagle population has increased modestly, the

10  makeup of this population and its decreasing productivity suggests that desert eagles still

11  remain at serious risk of extinction.  Subadults are present in extremely high numbers in

12  the breeding pairs (evidence of high adult mortality), and fledgling mortality is likewise

13  excessive.

14      41.    The desert eagle faces numerous threats to its habitat.  Most significantly,

15  the riparian ecosystems that desert eagles critically rely on for existence are in sharp

16  decline.  The Southwest has already lost about 90% of its historical riparian

17  communities, and the remaining riparian areas are declining due to increased human

18  development, dewatering of riparian streams, effects of cattle grazing, recreational

19  disturbance, mining, a declining prey base, toxic pollution, global climate change, and

20  lack of native vegetation-rejuvenating floods causing a loss of riparian trees and snags

21  used for breeding.  Population growth in and around desert eagle habitat exacerbates

22  these impacts.  Maricopa County is expected to see its population double to 6 million

23  people and cities along the Verde River such as Cottonwood and Camp Verde are

24  expected to triple their population in the next several decades. This population growth

25  causes substantial ecosystem pressures of increased development, water use and

26  recreational impacts.  Dam projects and stream diversions, coupled with excessive

27  ground water mining in drought-prone areas cause degradation and loss of riparian

28  communities, and adverse impacts and local extirpation of aquatic flora and fauna.

1    Moreover, because fish found in riparian systems are the primary food source for the

2    desert eagle, the desert eagle faces substantial threats with native fish decline.  The

3    native fishery with which the desert eagle evolved suffers substantial decline for many of

4    the same reasons desert eagles are in decline – loss of riparian habitat.  Of the 20 native

5    fish of the Gila River Basin, one is extinct, six are extirpated, nine are listed as

6    Threatened or Endangered, and nine of the ten others merit greater protection.  Despite

7    these threats to the desert eagle food source, exotic fish continue to be introduced to

8    native fish habitat.

9        42.    Not only does the desert eagle face significant threats, its current small

10   population size and reproductive isolation make it extremely vulnerable to loss of genetic

11   variability,[1] which in turn limits the population's options for adaptation to changing

12   environmental conditions such as global warming.

13

14                **THE PETITION TO LIST THE DESERT EAGLE DPS**

15       43.    On October 6, 2004, Plaintiffs filed a Petition asking the Service to

16   designate desert eagles as a distinct population segment ("DPS") and to list the DPS as

17   an endangered species under the ESA.  The Petition also requested that the Service

18   designate critical habitat for the desert eagle DPS.

19       44.    The ESA mandates that the Secretary of the Interior, to the maximum

20   extent practicable, make an initial finding as to whether a petitioned action may be

21   warranted within 90 days after receiving a listing petition ("90-day finding").

22   Accordingly, the desert eagle 90-day finding was due on or about January 11, 2005.

23       45.    Because the Service had failed to issue a 90-day finding over a year after

24   the desert eagle Petition had been submitted, the Center brought suit against the Service.

25

26

27   _____

[1]     With a small population, the loss of just one eagle can mean the loss of an entire

28   gene which can mean the loss of an entire genetic adaptation.

The Parties reached a settlement in which the Service agreed to issue a 90-day finding by August 23, 2006.

46.     On August 30, 2006, FWS' 90-day finding was published in the Federal Register and concluded that the Center's Petition did not present substantial information that desert eagles qualify as a DPS.  The Service also concluded that desert eagles, if they qualified as a DPS, were not threatened or endangered.

47.     While acknowledging that desert eagles are "discrete" from other bald eagle populations, the 90-day finding nonetheless concluded that the desert eagle population was not "significant" enough to warrant listing as a DPS.  In making this determination, the Service reversed over 30 years of findings, including its own, regarding the unique nature of desert eagles.

48.     The 90-day finding also concluded that the threats to the desert eagle were insignificant.  The Service simply stated that it believes "awareness, collaboration, flexibility, planning, and willingness of all wildlife, land, and recreation managers" will obviate the threats, and that other voluntary or otherwise unenforceable measures will adequately protect the eagle. 71 Fed. Reg. at 51556-60.

49.     The 90-day finding did not analyze whether the desert eagle population itself is endangered, threatened, or recovered; indeed, the Service currently lacks the tools to perform such an analysis because it has failed to develop (for a recovered population) or to update (for a threatened population) criteria for determining when the desert eagle population and habitat have attained these status milestones.  The Service insinuated in the 90-day finding that the current number of desert eagles is adequate because it is greater than previous population numbers.  However, the Service failed to provide an explanation as to why the number of eagles currently present in this reproductively isolated population is sufficient to constitute a secure population. Population viability studies, on the other hand, including ones presented in the Petition, show that the desert eagle is likely to go extinct in approximately 75 years.

## THE SUIT AGAINST FWS CHALLENGING ITS 90-DAY FINDING

50.     Plaintiffs sent a sixty-day notice of intent to sue to the Secretary and Service on November 2, 2006, satisfying statutory notice requirements.

51.     On March 6, 2008, this Court noted that a number of FWS biologists believed that desert eagles may be "significant" to the overall bald eagle population – one of the key criteria for finding the desert eagles are a DPS. *Center for Biological Diversity v. Kempthorne*, No. CV 07-0038-PHX-MHM, slip op. at 11, 2008 WL 659822 (D. Ariz. Mar. 6, 2008) (hereinafter *CBD v. Kempthorne*).  However, FWS officials at the regional and national levels of the agency determined that the listing petition should be denied, summarily reversing the biological findings of its agency experts and issued "marching orders" to biologists, who noted in a conference call that "[w]e've been given an answer now we need to find an analysis that works." *Id*.  Upon reviewing FWS' actions, this Court found the agency's decision "to exemplify arbitrary and capricious agency action." *Id*. The court's March 6, 2008 Order provides yet another illustration that FWS's program remains mired in dysfunction and ethical morass documented by two Interior Department Inspector General reports. *See* Office of Inspector General, U.S. Department of Interior, investigative Report: The Endangered Species Act and the Conflict Between Science and Policy (2008); Office of Inspector General, U.S. Department of Interior, Investigative Report: Allegations Against Julie McDonald, Deputy Assistant Secretary, Fish, Wildlife, and Parks (2007).  These reports concluded that Julie MacDonald, Former Deputy Assistant Secretary of U.S. Fish and Wildlife Service improperly imposed her policy agenda by heavily reshaping the scientific reports prepared by field biologists, despite her complete lack of background in biological sciences.  This resulted in several legally indefensible determinations by the FWS that required science-based support, yet were corrupted by MacDonald and other officials' political agendas.   The report also found that MacDonald improperly disclosed non-public information to private sector industry representatives.

52.     Asserting that it had "no confidence in the objectivity of the agency's decision-making process," this Court, in its March 6, 2008 order, set aside FWS' determination that desert eagles were not eligible for protection under the ESA and ordered the agency to conduct a status review of the population. *CBD v. Kempthorne*, 2008 WL 659822 at 14.  This Court also granted injunctive relief to protect desert eagles during the period of time required to complete the court-ordered status review.  Pointing to the "many threats" facing desert eagles, the Court emphasized that it was "not willing to risk the continued vitality of the Desert bald eagle pending the FWS' lawful determination of whether listing the Desert eagle as a DPS is warranted, and if so, whether the Desert eagle DPS should continue to receive ESA protections." *Id*. at 15. Accordingly, this Court enjoined FWS from removing desert eagles from the list of threatened species until "FWS makes a lawful determination of their status as a DPS." *Id*.

## FWS' ACTIONS ON REMAND

53.     After almost 18 months of analysis and evaluation of information gained from comments of interested experts, tribes, and members of the public, the biologists in FWS' Region 2 developed a draft 12-month finding concluding that desert eagles are "significant" to the species of bald eagles as a whole and thus are eligible for listing as a DPS. In a detailed memorandum to the assistant Director of FWS in Washington, D.C. dated August 24, 2009, the Regional Director of FWS' Region 2 office, Benjamin Tuggle, noted that the region was preparing a draft finding concluding that desert eagles are eligible for listing as a DPS due to "the uniqueness of the Sonoran Desert ecological setting and its significance to the species."  The memo to headquarters provided detailed findings to support this conclusion.

54.     In its August 24, 2009 Memo, Region Two Director Tuggle also expressed concern that the Washington office was adding unwarranted elements to the DPS Policy that could affect the determination of desert eagles' listing eligibility.  Tuggle rejected the Washington office's interpretation of the DPS Policy as inconsistent with the

longstanding interpretation of the policy and even inconsistent with one of the DPS authors' statements of the intention of the policy.  Tuggle noted that the Washington office incorrectly applies the DPS policy when it requires demonstration that the desert eagle population adapted evolutionarily to the unique ecological setting in order to support a finding of "significance."   Tuggle relies on statements made by agency solicitors and even one of the co-authors of the DPS Policy itself, confirming in a conference call that "it was not the intention of the [DPS] policy, when written, to require evidence of evolutionary adaptations," and that such evidence "is not required by the policy."

55.     In requiring evidence of evolutionary adaptations to support conclusions of "significance to the taxon as a whole," the Washington office completely reversed its longstanding interpretation of its DPS policy.  It is particularly instructive (and disturbing) that this "evolutionary significance" factor was also previously employed by FWS in its politically-based negative 90-day finding that this Court found arbitrary and illegal. A Department of Interior Inspector General report into improper political influence in ESA listing decisions noted the role of this factor in FWS' initial finding that desert eagles are not "significant":

> On July 18, 2006, Mary Richardson [of the FWS Arizona Office] participated in a telephonic conference concerning the southwestern bald eagle with [Chris] Nolin and [Doug] Krofta from the FWS Washington Office. Richardson stated that during the call, Nolin and Krofta discussed a negative finding on the discreteness prong, yet Richardson and other field personnel suggested that the finding could instead possibly be positive. Richardson said that when significance was discussed, Krofta and Nolin stated that [Ren] Lohoefener wanted to apply an evolutionary standard to the significance prong. Richardson objected stating that this standard was not a part of the FWS DPS Policy. When she asked them to identify an instance when this standard had been used in the past, Krofta and Nolin responded by stating that this was the *first time* it had ever been applied.

DOI Report at 48 (emphasis added). Tuggle's memo, coupled with this report, shows that a primary line of reasoning upon which the new 12-month finding relies to find that

1    desert eagles are not "significant" is the *same* rationale initially created by the agency in
2    its improper efforts to avoid protecting these birds.

3        56.    Moreover, prior to this arbitrary and unexplained reversal of interpretation
4    to its DPS policy, the FWS listed both the North American Green Sturgeon and the
5    Mountain Yellow Legged Frog as Distinct Population Segments based solely on the
6    populations' persistence in unique ecosystems.  The Service did not impose any
7    overarching requirement for evolutionary adaptations for a finding of significance to the
8    taxon as a whole.

9        57.    In a letter dated December 4, 2009, nearly two years after this Court
10   ordered the Service to reconsider its initial decision on desert eagles and only a few
11   weeks before the Court's extended deadline for a new finding, the FWS Assistant
12   Director provided a one-page response to the detailed Region 2 memo which rejected the
13   region's concern that the Service had modified its interpretation of its DPS policy, and
14   did not address any of the regional office's biological findings.  The Assistant Director
15   also informed the regional office that he had made a decision that "the best data currently
16   available also supports a conclusion that this population [of desert eagles] is not a valid
17   DPS."  Finally, he instructed the region that his "staff will work with [the regional office]
18   on development of the revised version of the finding," clearly signaling that the
19   Washington office would step in to help re-write the then-draft positive 12-month
20   finding to reach the opposite conclusion.

21       58.    After requesting several extensions of time to complete its status review,
22   the Service published its final negative 12-month finding in the Federal Register on
23   February 25, 2010.  After nearly two years of analysis, the new finding reaches a
24   conclusion identical to that made by the agency in response to the Center's initial listing
25   petition and later overturned by this Court – namely that desert eagles are not
26   "significant" to the overall bald eagle population and thus do not qualify as a DPS
27   eligible for protection under the ESA.  The Service's final negative 12-month finding
28   ignores biological information developed by regional biologists, instead reaching key

conclusions exactly opposite to those of the agency biologists who had worked on this Court's remand for nearly a year and a half.  For example, the Service reached inconsistent conclusions with agency biologists on the significance of the adaptations to cliff nesting, its contributions to the taxon as a whole due to its adaptations signifying resiliency of the population, and its ability to persist in hot, arid environments in the face of predicted increasing temperatures and aridity resulting from climate change.

59.     This 12-month finding runs contrary to the Center's Petition, the Service's files, and the scientific and legal conclusions reached by the Service's state and regional offices after nearly a year and a half of status review.  The Petition and files provide substantial evidence supporting the desert eagle's significance to the entire bald eagle population due to the population's peripheral location, its unique behavioral adaptations, its morphological and genetic characteristics, and its reproductive isolation.

60.     On February 24, 2010, the Service moved this Court to dissolve its injunction preventing the application of the final delisting rule to the desert eagle population.  The Center also moved this Court to allow a Supplemental Complaint to include the Center's subsequent challenges to the Service's new 12 month finding.  Doc. 88.

61.     On September 30, 2010, this Court granted the Service's Motion to Dissolve the Injunction that enjoined the final application of the bald eagle delisting rule for all bald eagle populations. Doc. 130 at 11.  This Court also declined to grant the Center's Motion to Supplement the Complaint, finding that the substance of the Service's 12 month finding is more appropriately reviewed in a new, separate action. Doc. 130 at 10.

62.     The Service  takes the position that  desert bald eagles were  delisted the moment the court issued its order dissolving the injunction.  It asserts that a Federal Register notice does not operate to delist the species, but merely provides notice of the delisting to the public. Thus, under the Service's view,  desert  eagles are immediately without the habitat and other protections the ESA provides.

1

2                    **FIRST CLAIM FOR RELIEF**

3        **(Failure to Rely on the Best Scientific and Commercial Data Available)**

4        63.     Each of the allegations set forth above are incorporated by reference

5             herein.

6        64.     When making a listing determination pursuant to the ESA, the Service

7   must rely on the best scientific and commercial data available.  ESA § 4(b)(1)(A), 16

8   U.S.C. § 1533(b)(1)(A).

9        65.     In the negative 12-month finding for desert eagles, the Service ignored or

10  discounted information, including findings from its own regional biologists, that desert

11  eagles persist in an ecological setting that is unique for the taxon; that loss of the desert

12  eagle population would result in a significant gap in the range of the species; that desert

13  eagles differ markedly from other populations of the species in their genetic

14  characteristics; and that desert eagles are significant due to their morphological and

15  behavioral characteristics as well as their reproductive isolation. The Service thus failed

16  to use the best scientific information available in assessing whether desert eagles

17  constitute a distinct population segment under the ESA.  For example, Service biologists

18  in the Southwest region determined that "[w]here both cliff and tree nests were available,

19  cliff nests were selected 73 percent of the time, which is atypical of the species in other

20  portions of its range." Exhibit 2 at 2. In contrast, the agency's published finding ignores

21  this information, simply asserting that "[b]ald eagles use whatever high nests are

22  available near riparian areas they inhabit in the Sonoran Desert Area; these sites often

23  happen to be cliffs." Exhibit 1 at 66. By disregarding the significant percentage of eagles

24  that choose cliff sites even when tree sites are available, the Service failed to consider the

25  best available scientific information it purportedly was relying upon to make its 12-

26  month finding.

27       66.     By ignoring or discounting the best available scientific information,  as

28  well as  selectively choosing from its files which information to rely on, or not rely on,

1  in assessing the desert eagle's designation as a DPS, the Service violated the ESA's

2  requirement that the agency base its listing determinations on the best scientific and

3  commercial data available.  ESA § 4(b)(1)(A), 16 U.S.C. § 1533(b)(1)(A).  As a result,

4  the agency's desert eagle 12-month finding was and is arbitrary, capricious, an abuse of

5  discretion and otherwise not in accordance with the ESA within the meaning of the APA.

6  5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF

### (Improper DPS Analysis)

67.    Each of the allegations set forth above are incorporated by reference

herein.

68.    For over thirty years, the Service has considered desert eagles to be a unique population.

69.    Such a finding is unremarkable given the fact that these eagles comprise the only bald eagle population in the United States to persist in a desert ecosystem.  More precisely, because of their long persistence in, and adaptation to, a hot, dry, desert environment, desert eagles display unique adaptations to that environment, namely early season breeding, use of cliffs as nesting sites,  smaller sizes than other bald eagles, and other characteristics. The Center's Petition, and FWS files, also contain evidence of the desert eagle's significance to the entire bald eagle population due to the population's peripheral location, its unique behavioral adaptations, its morphological and genetic characteristics, and its reproductive isolation.

70.    Despite the substantial evidence indicating that desert eagles, unlike any other population of bald eagles, occupy and have adapted to a desert environment, the Service in its 12-month finding ignored the biological findings of its field experts and concluded "the best information available does not indicate that persistence in the ecosystem of the Sonoran Desert Area is important to the species as a whole."

71.    The Service's conclusion that desert eagles are not "significant" to the bald eagle population as a whole and therefore do not qualify as a DPS is not rationally

related to the information available to the agency.  As a result, FWS' conclusion in its 12-month finding on the Center's Petition that desert eagles do not constitute a DPS is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA within the meaning of the APA.  5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF
### (Arbitrary Application of the DPS Policy)

72.   Each of the allegations set forth above are incorporated by reference herein.

73.   Under the ESA, a species is explicitly defined to include "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature." ESA § 3(16), 16 U.S.C. § 1532(16) (emphasis added).

74.   The Service's statutory authority under § 3(16) of the ESA to list a species population as a distinct population segment (DPS) does not require any evidence of evolutionary adaptations to unique ecosystems.

75.   Further, no regulations exist in the Code of Federal Regulations interpreting the statutory term "distinct population segment."

76.   The Service's DPS Policy was promulgated on February 7, 1996.  Nothing within the policy and no application of the policy prior to the desert eagle decision has required a showing of evolutionary adaptation to unique ecosystems in order to establish "significance" to the taxon as a whole. Moreover, in applying its DPS Policy in the past – save for the case of desert eagles – FWS has never required evidence that a population has adapted evolutionarily to its unique surroundings in order to determine that a population constitutes a DPS. As documented by a Department of Interior Inspector General Report examining instances of political interference in the ESA's listing process, the Service required such evidence for the first time when it in initially determining that

1   desert eagles are not "significant" and thus are not eligible for listing as a DPS. This

2   Court overturned that decision.

3       77.    In once again requiring evidence of evolutionary adaptation to a unique

4   ecological setting, the Service has unlawfully interpreted the ESA as well as its own DPS

5   Policy. Therefore, the Service's misapplication of both the ESA's definition of "species"

6   and the Service's own DPS policy is arbitrary, capricious, an abuse of discretion and

7   otherwise not in accordance with the ESA within the meaning of the APA.  5 U.S.C. §

8   706(2).

9                              **PRAYER FOR RELIEF**

10      Plaintiffs request that this Court enter judgment providing the following relief:

11          1.    Issue a Declaratory Judgment that Defendants are in violation of the

12              law for each and every Count as alleged herein;

13          2.    Declare unlawful and set aside the Service's negative 12-month

14              finding on the status review for desert eagles;

15          3.     Enter an injunction compelling the Service to reconsider its 12

16              month finding that desert eagles are not "significant" and thus are

17              not eligible for protection as a distinct population segment, and

18              promptly conduct a *lawful* full status review for desert eagles to

19              determine whether they are threatened or endangered as defined in

20              the Endangered Species Act;

21          4.     Enjoin the Service from removing ESA protection for desert eagles

22              until the Service has complied with the terms of this injunction and

23              retain jurisdiction over FWS' actions to comply with this remand to

24              ensure that FWS halts its pattern of arbitrary actions in assessing

25              protections for desert eagles and finally performs a fair, transparent,

26              and rational assessment of whether desert eagles qualify as a DPS,

27              as well as whether this population is threatened or endangered;

28

5.      Award Plaintiffs their costs of litigation, including reasonable
attorneys' fees as provided in the ESA, the Equal Access to Justice
Act and/or any other applicable law; and

6.      Any other such relief as the Court deems just and proper.


Respectfully submitted this 5th day of October, 2010,

/S/ Howard Shanker

Howard M. Shanker
THE SHANKER LAW FIRM, PLC.
700 E. Baseline Road, Bldg. B
Tempe, Arizona 85283
Phone: (480) 838-9300
Facsimile: (480) 838-9433
howard@shankerlaw.net


Attorney for Plaintiffs