1   **WO**

2

3

4

5

6             IN THE UNITED STATES DISTRICT COURT

7               FOR THE DISTRICT OF ARIZONA

8

9   Center for Biological Diversity and      No. 10-2130-PHX-DGC
    Maricopa Audubon Society,

10                    **ORDER**
              Plaintiffs,

11       and

12   San Carlos Apache Tribe, a federally
    recognized Indian tribe, and Salt River

13   Pima-Maricopa Indian Community, a
    federally recognized Indian tribe,

14

15   Plaintiff-Intervenors,

16   vs.

17   Kenneth Salazar, in his official capacity as
    Secretary of the United States Department

18   of the Interior, and Daniel Ashe, in his
    official capacity as Director of the United

19   States Fish and Wildlife Service,

20               Defendants.

21

22

23        Plaintiffs Center for Biological Diversity ("the Center") and the Maricopa

24   Audubon Society filed this action against Kenneth Salazar in his official capacity as

25   Secretary of the United States Department of Interior ("Interior") and Rowan Gould in

26   his official capacity as acting Director of the United States Fish and Wildlife Service

27   ("FWS").  Plaintiffs ask the Court to set aside FWS's finding that the desert bald eagle

28   ("desert eagle") does not qualify as a distinct population segment ("DPS") of bald eagles

entitled to statutory protection under the Endangered Species Act ("ESA").  The San Carlos Apache Tribe and the Salt River Pima-Maricopa Indian Community intervened as Plaintiffs.[1]

Plaintiffs have filed motions for summary judgment (Docs. 57, 61, 63) and Defendants have filed a cross motion for summary judgment (Doc.73).  The motions are fully briefed.  Docs. 75-77, 81-83, 85.  The Pacific Legal Foundation ("PLF") has filed a motion for leave to submit an amicus curiae brief in support of Defendants.  Docs. 71. The Court will grant PLF's motion and consider its amicus curiae brief.  Doc. 72.  Oral argument was held on November 22, 2011.  For reasons that follow, the Court will grant Plaintiffs' motion for summary judgment in part, deny Defendants' motion, and remand the DPS determination to FWS for further consideration.

## I.      Statutory Framework.

Congress enacted the ESA primarily "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b); *see National Audubon Society, Inc. v. Davis*, 307 F.3d 835,852 (9th Cir. 2002).  Congress declared that all Federal departments and agencies "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of this chapter."  16 U.S.C. § 1531(c)(1).  The Secretaries of Commerce and Interior have delegated their responsibilities under the ESA to the National Marine Fisheries Service ("NFMS") for marine life, and to FWS for all other species.  50 C.F.R. § 402.01; *see Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F. 3d 969, 973-74 (9th Cir. 2003).

The ESA provides for the development and implementation of recovery plans to identify, describe, and schedule the actions necessary to restore endangered and

---

[1] Throughout this order, the Court will use the term Plaintiffs to refer to both Plaintiffs and the Tribes.

threatened species to a more secure condition.  16 U.S.C. § 1533(f).  These substantive protections for a species and its habitat are triggered for a terrestrial species only if the Secretary of Interior, acting through FWS, formally lists that species as either endangered or threatened.  *Id.* at § 15339(a)(1) & (d).  An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A threatened species is "any species that is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).  In addition, the ESA defines "species" to include any "distinct population segment of any species."  16 U.S.C. § 1532(16).  ESA listing determinations must rely solely on the best scientific and commercial data available; at no point may FWS consider political and economic factors. 16 U.S.C. § 1533(b)(1)(A), 50 C.F.R. § 424.11(b).

## A.    90-Day Finding.

Any interested person may file a petition with the Secretary of the Interior to list a species as threatened or endangered under the ESA. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. 424.14(a).  On receipt of such a petition, FWS must review the petition and, "to the maximum extent practicable," make a finding within 90 days as to whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b). This determination commonly is referred to as a "90-day finding."  ESA regulations define "substantial information" as "the amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b).

If FWS concludes in its 90-day finding that the petition does not present substantial information indicating that a petitioned listing may be warranted (a "negative 90-day finding"), then FWS must publish the finding in the Federal Register.  16 U.S.C.

§ 1533(b)(3)(A).  At that point the administrative listing process is complete and may be challenged in federal court.  *Id.* at § 1533(b)(3)(C)(ii).

**B.      Status Review and 12-Month Finding.**

If FWS concludes in its 90-day finding that the petition does present substantial information indicating that the listing may be warranted (a "positive 90-day finding"), then FWS must publish the finding in the Federal Register and proceed with a more detailed "review of the status of the species concerned" in order to determine whether listing the species is "warranted."  *Id.* at. § 1533(b)(3)(B).  This more detailed inquiry commonly is referred to as a "status review," and requires FWS to "consult as appropriate with affected States, interested persons and organizations, [and] other affected Federal agencies."  50 C.F.R. § 424.13.  FWS guidelines provide that FWS "must conduct the [status] review after soliciting comments from the public by publishing a notice in the Federal Register and notifying State, Tribal, and Federal officials and other interested parties of the need for information."  *See* FWS Petition Management Guidance, p. 9 (http:// www.nmfs.noaa.gov/pr/pdfs/laws/petition_management.pdf).

After the status review, and within 12 months of the receipt of the petition, FWS must determine whether listing of the species is warranted, not warranted, or warranted but precluded by other listing priorities.  16 U.S.C. § 1533(b)(3)(B).  This determination commonly is referred to as a "12-month finding."  If FWS determines that listing of the species is warranted, then it must publish a proposed listing rule in the Federal Register and solicit public comment. 16 U.S.C. § 1533(b)(5).  Within 12 months of publishing the proposed rule and after considering public comment and all relevant evidence, FWS must make a final decision whether to formally adopt the proposed listing rule.  16 U.S.C. § 1533(b)(6).

FWS and the NMFS ("the Services") have developed a "Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act" (the "DPS Policy").  61 Fed. Reg. 4722-01 (Feb. 7, 1996).  Under the DPS Policy,

FWS must consider three elements in deciding whether a population segment qualifies as a DPS: (1) the discreteness of the population segment in relation to the rest of the species, (2) the significance of the population segment to the species, and (3) the population segment's conservation status in relation to the ESA's standards for listing species as endangered or threatened. *Id.* at 4725. A population is discrete if it either "is markedly separated from other populations as a consequence of physical, physiological, ecological, or behavioral factors," or "is delimited by international governmental boundaries" subject to significantly different management and conservation policies. *Id.* A population is significant if available scientific evidence shows that it is "importan[t] to the taxon to which it belongs." *Id.* If FWS concludes that a population segment is both discrete and significant, then it must consider whether the petition presents substantial information that the population segment should be listed as threatened or endangered under the ESA. 61 Fed. Reg. 4725; 50 C.F.R. § 424.14(b).

## II.     Factual Background of this Case.

The bald eagle was first listed as an endangered species on March 11, 1967. The listing occurred under the Endangered Species Preservation Act of 1966, a predecessor to the ESA. 75 Fed. Reg. at 8,601. Following enactment of the ESA in 1973, the bald eagle was listed as endangered in 43 states and as threatened in Michigan, Minnesota, Wisconsin, Oregon, and Washington. 72 Fed. Reg. 6230 (Feb. 14, 1978). On July 12, 1995, the bald eagle was reclassified as threatened in all states. 75 Fed. Reg. at 8,602.

The bald eagle is an ESA success story. Its numbers have increased significantly throughout the United States over the last several decades, from an estimated 487 breeding pairs in 1963 to an estimated 9,789 breeding pairs in 2007. 72 Fed. Reg. 37346.

In 2004, as FWS was considering removing the bald eagle from the threatened species list, the Center filed a petition asking that FWS list desert eagles as a DPS. When FWS failed to respond within 90 days as required by the ESA, the Center filed suit. The parties subsequently reached a settlement agreement under which FWS agreed to issue a

90-day finding by August 30, 2006. The resulting 90-day finding concluded that the Center had not presented sufficient scientific or commercial information to support its petition. *See* 71 Fed. Reg. 51,549, 51,551 (Aug. 30, 2006). As a result, FWS did not initiate a status review or solicit comments to determine whether the desert eagle qualified as a DPS.

In response to FWS's negative 90-day finding, the Center filed suit in this Court. *See Ctr. for Biological Diversity v. Kempthorne*, No. CV 07-0038-PHX-MHM, 2008 WL 659822 (D. Ariz. March 6, 2008). The Center alleged that FWS had violated the ESA by not basing its 90-day finding on the best available evidence, and asked the Court to set aside the finding as arbitrary and capricious under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701-706. Judge Mary H. Murguia agreed with the Center and found that the record before FWS was sufficient for a reasonable person to conclude that the Center's petition "may be warranted." *Id.* at *8-12. Judge Murguia stated that she had "no confidence in the objectivity of the agency's decision making process" due, in part, to evidence in the record that FWS officials in Washington, D.C. had given "marching orders" to local FWS personnel that the petition was to be denied, stating that the local FWS personnel should make their analysis support this policy decision. *Id.* at *11-12.

After issuing its negative 90-day finding, but before Judge Murguia ruled, FWS issued a rule removing all bald eagles in the United States from the threatened species list ("the 2007 delisting rule"). The 2007 delisting rule included a finding that the desert eagle is not a DPS. FWS argued before Judge Murguia that the 2007 delisting rule rendered its 90-day finding on the Center's petition moot. FWS argued, in effect, that the 2007 delisting rule had the same effect as a status review and 12-month finding, and that reversing the negative 90-day finding and ordering such a status review would therefore be an unnecessary exercise. Judge Murguia disagreed, noting that FWS had not complied with the procedural requirements for a status review when it made the DPS finding in the 2007 delisting rule. Judge Murguia noted that a DPS status review requires notice and

public comment, and yet the notice for the 2007 delisting rule had specifically stated that FWS did *not* intend to analyze whether any particular bald eagle population was a DPS. *Id.* at *8.  As a result, those potentially interested in commenting on whether the desert eagle qualified for DPS status had no notice that FWS would be addressing that issue. Although FWS did receive and consider some comments, Judge Murguia found that this was not the equivalent of a full status review.  *Id.* at *5-8.  Judge Murguia ordered FWS to conduct a full status review and issue a 12-month finding on whether the desert eagle constituted a DPS.  *Id.* at *16.  She enjoined FWS from applying its 2007 delisting rule to the desert eagle until the status review and 12-month finding were complete.  *Id.*

As a result of this order, FWS undertook a status review of the desert eagle with full notice and public comment.  FWS published its 12-month finding in the Federal Register on February 19, 2010, finding that the desert eagle was "discrete" but not "significant" to the species as a whole, and therefore not entitled to DPS treatment.  *See* 75 Fed. Reg. 8,601-01 (Feb. 25, 2010).  FWS filed a motion to have Judge Murguia's injunction against delisting the desert eagle lifted.  *See Ctr. for Biological Diversity v. Salazar*, No. CV 07-0038-PHX-MHM, 2010 WL 3924069 (D. Ariz. Sept. 30, 2010). Judge Murguia lifted the injunction, stating that its purpose had been to forestall delisting of the desert eagle until FWS had completed a full status review.  *Id.* at *4.  Because FWS had complied with the review, Judge Murguia found that conditions for lifting the injunction had been met.  *Id.*

The Center asked Judge Murguia to grant leave to file a supplemental complaint, arguing that FWS had made an arbitrary and capricious 12-month finding.  *Id.* at *3. Judge Murguia found that the question of whether the 12-month finding violated the ESA and APA was factually and legally distinct from the question of whether FWS acted unlawfully when it issued the negative 90-day finding, and therefore denied the Center's request to file a supplemental complaint.  As a result, Plaintiffs filed this case, alleging that FWS and Interior violated the ESA and APA in issuing the 12-month finding.

Docs. 1, 25, 41.  In addition to raising ESA and APA claims, the Tribes argue that FWS failed to incorporate traditional ecological knowledge into its findings and violated its obligation to consult meaningfully with the Tribes on a government-to-government basis.

**III.   Standard of Review.**

The APA governs judicial review of administrative decisions involving the ESA. *Aluminum Co. of America v. Bonneville Power Admin.*, 175 F.3d 1156, 1160 (9th Cir.1999).  "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Engineering Co. v. Immigration and Naturalization Service,* 753 F.2d 766, 770 (9th Cir.1985).  The Court must set aside a final, non-discretionary agency action that is arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law.  *Mt Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993).

An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  In conducting an APA review, the Court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,* 273 F.3d 1229, 1243 (9th Cir.2001).  The standard for review "is 'highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision.'" *Kern County Farm Bureau v. Allen,* 450 F.3d 1072, 1076 (9th Cir.2006) (quoting *Indep. Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir.2000)).  At the same time, a reviewing court "must not rubber-stamp . . . administrative decisions that [the court deems] inconsistent with a statutory

mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 859 (9th Cir.2005).

**IV.    Is The 12-Month Finding Procedurally Flawed?**

Plaintiffs argue that FWS's 12-month finding is procedurally flawed because FWS disregarded the uniform view of biologists and its own Arizona and Region 2 staff that the desert eagle qualified for DPS status, and instead arbitrarily stood by its 2007 delisting rule.  The Court will address this argument before considering other issues raised by the motions.

As noted above, the DPS Policy requires FWS to consider three elements in deciding whether a population segment qualifies as a DPS – discreteness, significance, and conservation status.  61 Fed. Reg. 4725.  FWS concluded in the 12-month finding that the desert eagle population is discrete.  FWS found a lack of bald eagle immigration into and emigration from the desert eagle population.   FWS also found that the geographic areas immediately surrounding the desert eagle's habitat lack appropriate eagle habitat and contain no known breeding bald eagles.  75 Fed. Reg. 8616.

FWS then turned to the significance inquiry and found that although the desert eagle population is discrete, it is not significant to the bald eagle population as a whole. *Id.* at 8616-20.  Plaintiffs challenge this significance determination.

Under the DPS Policy, significance depends on "available scientific evidence of the discrete population segment's importance to the taxon to which it belongs."  61 Fed. Reg. 4725.   The policy directs FWS to consider the following non-exclusive list of factors:

1.    Persistence of the population segment in an ecological setting unusual or unique for its taxon;

2.    Evidence that loss of the discrete population segment would result in a significant gap in the range of the taxon;

3.    Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside of its historic range; or

4.    Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

*Id.*

The 12-month finding focused primarily on the first two factors.  Although FWS found that the desert eagle persists in an ecological setting that is unique, FWS concluded that this "persistence is not significant to the taxon as a whole because these particular eagles exhibit similar behavior and nesting adaptations to their setting as do bald eagles in other settings."  75 Fed. Reg. 8619.  In addressing the second factor, FWS concluded that "loss of eagles in the Sonoran Desert Area would not represent a significant gap in the range of the species due to a loss of biologically distinctive traits or adaptations, or genetic variability of the taxon."  *Id.*

Although Plaintiffs dispute the soundness of these conclusions in light of evidence in the administrative record, they first argue that FWS employed a flawed procedure to arrive at these conclusions.  Plaintiffs base this argument on the following facts – facts not disputed by Defendants.

After remand from Judge Murguia, FWS initiated a status review by publishing notice in the Federal Register and initiating consultations with interested Indian tribes. Doc. 65, ¶ 15.  FWS received 36 written comments in response to the notice, including submissions from the State of Arizona Game and Fish Department ("AGFD"), a variety of organizations, Indian tribes, and individuals, and comments from three former members of FWS's Southwest Bald Eagle Recovery Team.  *Id.*, ¶16.  Every biologist and the AGFD concluded that desert eagles meet the criteria for DPS treatment.  *Id.*; *see also id.* at 7-10 (summarizing comments from 10 commentators).

FWS scientists in Arizona also found that desert eagles meet the criteria of the DPS Policy and are therefore eligible for listing as a DPS.  Between November of 2008 and September of 2009, the FWS Arizona office produced ten versions of a draft 12-

month finding which concluded that desert eagles are discrete and significant under the DPS Policy.  *See* AR3342, 3540, 4043, 4180, 4228, 4262, 5400, 5925, 6884, 7309.  Each draft found that desert eagles meet the DPS Policy's significance criterion because desert eagles inhabit an ecological setting unique for the species, and loss of the population would result in a significant gap in the range of bald eagles.  *Id.*

The Regional Director of FWS Region 2 (which includes Arizona) agreed.  The Regional Director submitted a decision memorandum to the FWS Director in Washington, D.C. which summarized the Arizona office's conclusion that desert eagles meet the significance criterion of the DPS Policy.  *See* AR6680-6684.  Several conference calls and other communications then occurred between the Arizona, Region 2, and Washington, D.C. offices of FWS.

On October 12, 2009, the FWS Assistant Director for Endangered Species, Gary Frazer, issued an email which concluded that the desert eagle does not qualify for DPS status.  He provided this explanation:

> My conclusion was based on my evaluation of the facts at hand, the previous DPS analysis, and [the] proposed finding [from the Arizona office and Region 2].  I found no significant new information since the previous DPS analysis, nor did I see any obvious error in the previous analysis.  Our DPS policy has not changed.  I believe it is important for the Service to stand by its previous decisions unless a change in fact or policy, or a finding of error, compels a different conclusion.  None of those were indicated here, so I did not concur with their proposal to reverse direction on the issue of Sonoran Desert bald eagles as a valid DPS.  The issue of evolutionary adaptation did not factor into my decision.

Doc. 65, ¶33; AR7497, 8006.  Mr. Frazer's reference to "the previous DPS analysis" was to the 2007 delisting rule.

On December 4, 2009, Mr. Frazer sent a memorandum to the Region 2 Director explaining his decision:

> As you know, a DPS analysis of the Sonoran Desert bald eagle population was conducted in the July 2007 delisting rule for the bald eagle.  I

appreciate the concerns you raised in the Region's memo that this analysis overlooked features of the unique desert environment, and that it did not focus on the birds' response or adaptation to the uniqueness of the Sonoran Desert setting.   I kept these concerns in mind while reviewing and evaluating the previous analysis and the Region's draft analysis, but was unable to find any error or omission in the previous DPS analysis.  It is my judgment that the [2007 delisting rule] reached the correct conclusion based on the best data available at the time.  Moreover, there does not appear any significant relevant new information, nor has our DPS policy changed since the previous analysis was published.  Thus, I conclude that the best data currently available also supports a conclusion that this population is not a valid DPS.  This conclusion is based on my evaluation of the past DPS analysis, portions of the administrative record made available to me, and the Region's draft analysis.

My staff will work with you on development of the revised version of the [12-month] finding.  Obviously, the finding should not simply cite to my conclusion, but rather reflect the thorough analysis of the best available information upon which the July 2007 DPS analysis and my conclusion was based.

Doc. 65, ¶39; AR8557.

As a result of the Assistant Director's decision, the 12-month finding was revised to conclude that the desert eagle population was discrete but not significant to the taxon as a whole, and therefore not entitled to DPS status.   75 Fed. Reg. 8601-20.   A comparison between the 12-month finding and the 2007 delisting rule shows that the 12-month finding incorporated much of the delisting rule verbatim.

This history from the administrative record establishes the following facts: (1) FWS undertook a status review and 12-month finding as directed by Judge Murguia and in conformity with FWS procedures; (2) the review elicited virtually unanimous comments from biologists that the desert eagle should be accorded DPS status; (3) the Arizona-based scientists in FWS and the Region 2 Director in New Mexico concluded that the desert eagle warrants DPS status; (4) this view was not accepted by the Assistant Director for Endangered Species in Washington, D.C.; (5) the Assistant Director based

his decision primarily on the 2007 delisting rule; and (6) the Assistant Director stood by the 2007 delisting rule because he found "no significant new information" from the status review, did not "see any obvious error in the [2007 delisting rule]," and felt FWS should stand by its previous decision "unless a change in fact or policy, or a finding of error, *compels* a different conclusion." AR8006 (emphasis added).

Stated differently, the 2007 delisting rule became FWS's decision on the DPS status of the desert eagle, to be departed from only if information generated in the status review or a change in FWS policy compelled a different result. FWS thus accorded great weight to the 2007 delisting rule, making it the de facto final decision unless compelling evidence to the contrary was found. Although courts must defer to procedurally sound agency decisions, deference is not warranted when procedures are flawed.

As already noted, FWS argued before Judge Murguia that the 2007 delisting rule should be treated as the agency equivalent of a status review and 12-month finding. Judge Murguia did not agree. She noted that the public notice for the 2007 delisting rule specifically stated that FWS "'need not at this time analyze whether any particular geographic area would constitute a DPS.'" *Kempthorne*, 2008 WL 659822 at *5 (quoting AR6564). Thus, far from calling for public comment on the potential DPS status of desert eagles, the notice specifically stated that such an inquiry would not occur. When the comment period for the delisting proposal was later extended, FWS again "made no mention of whether it was reviewing the status of bald eagles in any particular area to determine whether they constituted a [DPS]." *Id.* As a result, Judge Murguia found that the 2007 delisting rule failed to comply with the notice, comment, and consultation requirements for a DPS status review – "publishing a positive 90-day finding in the Federal Register that listing as a DPS may be warranted and consulting with interested parties in conducting a status review to determine whether listing as a DPS is truly warranted." *Id.* at *7. She found that FWS could not satisfy status review requirements simply by "slipping a statement into its July 9, 2007 delisting rule that it considered the

DPS issue [and found] that the Desert eagle population is not a DPS." *Id.* at *8.  Judge Murguia characterized FWS's contention that the 2007 delisting rule was the equivalent of a status review and 12-month finding as "far-fetched at best." *Id.* at *7.

This Court agrees that the 2007 delisting rule was not a valid status review for the desert eagle.  FWS did not comply with the notice, comment, and consultation requirements established by statute and regulations for a status review and 12-month finding.  *See* 16 U.S.C. § 1533(b)(3)(A), (B); 50 C.F.R. § 424.14(b)(3), 15(a) & (c).  As a result, the 2007 delisting rule should not have become FWS's de facto decision on the DPS issue, to be departed from only for compelling reasons.  An invalid status review should not trump a valid status review.  Findings reached without appropriate notice, comment, and consultation should not become an agency's presumptive decision.  Such a procedure flies in the face of the notice, comment, and consultations requirements of the law. *Id.*

What is more, it appears that the 2007 delisting decision was made at a time when FWS simply was not open to new information about the desert eagle.  Judge Murguia's invalidation of the negative 90-day finding reflects this fact.  She found that Arizona-based scientists within FWS found the DPS petition for the desert eagles to have merit, but that a "policy call" was made in Washington, D.C. and the local FWS office was given "marching orders" to reach a different conclusion.  *Kempthorne*, 2008 WL 659822 at *11 (quoting AR1985).  As one FWS manager stated, "'[w]e've been given an answer [and] now we need to find an analysis that works . . . .  Need to fit argument in as defensible a fashion as we can.'"  *Id.* (quoting AR1986-87).  Judge Murguia found that these and other communications on FWS's 90-day finding "appear to exemplify an arbitrary and capricious action." *Id.*

The 2007 delisting decision was made less than a year after the negative 90-day finding, and appeared designed in part to forestall Judge Murguia's ruling on the 90-day finding.  Indeed, FWS took the unusual step of asserting in the 2007 delisting rule itself

1   that the question before Judge Murguia "is now moot." *Id.* at *6.  Thus, it appears that

2   the 2007 delisting decision was made in the same environment as the negative 90-day

3   finding, an environment in which Washington's "policy call" resulted in "marching

4   orders" for FWS scientists in Arizona.  Needless to say, a result-driven decision should

5   not become the presumptive baseline for a subsequent and properly-noticed status review,

6   to be departed from only for compelling reasons.

7          The Court finds that FWS's 12-month finding was based on the 2007 delisting

8   rule, and that the 2007 delisting rule failed to comport with the notice, comment, and

9   consultation requirements of the law.  As a result, the Court concludes that the 12-month

10  finding is not in accordance with law and not "founded on a rational connection between

11  the facts found and the choices made." *Ariz. Cattle Growers' Ass'n,* 273 F.3d at 1243.

12         The Court will set aside the 12-month finding as an abuse of discretion and require

13  FWS to complete a new 12-month finding.  Because it does not appear that the status

14  review process was procedurally flawed, the Court will not require FWS to start the

15  process over again with notice and public comment.  The Court instead will require FWS

16  to complete a new 12-month finding based on information gathered and consultations

17  completed during the status review conducted in response to Judge Murguia's order.  The

18  Court expresses no view on the proper outcome of the new 12-month finding.

19  **V.   Plaintiffs' Other Arguments.**

20         Plaintiffs argue that FWS ignored a 2008 study by Allison that identified breeding

21  differences in the desert eagle, a study by ecologist Dr. Gary Meffe on the importance of

22  distinctive traits in peripheral populations to an overall species, a study by Dr. Irene

23  Tieleman on the adaptations of larks in arid climates, and traditional ecological

24  knowledge submitted by the tribes.  Because FWS will be required to complete a new 12-

25  month finding, the Court will leave it to FWS to deal with these sources of information in

26  the new finding.

27

28

Plaintiffs claim that FWS arbitrarily changed the DPS Policy without notice and comment by requiring additional proof of significance beyond a showing that a population segment persists in a unique ecological setting.  Doc. 64 at 23.  In particular, Plaintiffs allege that FWS required "an evolutionary standard" or a showing of adaptations to demonstrate significance.  *Id.* at 25.  Defendants argue that persistence in a unique ecological setting is not itself sufficient to support a finding of significance unless that finding also shows that the population segment is "significant to the taxon to which it belongs."  Doc. 75 at 21 (quoting 75 Fed. Reg. 8619 (citing to *National Ass'n of Home Builders v. Norton*, 340 F. 3d 835, 849 (9th Cir. 2003)).  In its new finding, FWS should address whether it has adopted a new interpretation of the DPS Policy and, if so, the reasons for and validity of the change.

Plaintiffs argue that even if an additional showing of significance is required, the record contained sufficient evidence of adaptations to support a finding that the desert eagle is significant to the taxon as a whole.  Plaintiffs similarly argue that in its analysis of the second consideration – whether loss of the population segment would result in a significant gap in the range of the taxon – FWS failed to offer a reasoned explanation for its determination that loss of the desert eagle would not result in a significant gap.  The Court will leave it to FWS to address these issues in the new 12-month finding.

## VI.    The Tribes' Consultation Arguments.

The Tribes argue that the long-standing principle requiring the United States to engage in meaningful government-to-government consultation with Indian tribes, codified through numerous executive branch orders and memoranda, is a legally enforceable obligation.  Docs. 61 at 28, 58 at 17-18.[2]  Defendants do not dispute this

---

[2] *See, e.g.*, President Clinton's May 14, 1998, and November 6, 2000, Executive Orders, "Consultation and Coordination With Indian Tribal Governments," Exec. Order No. 13084, Fed. Reg. 27655 (May 14, 1998), Exec. Order No. 1317563, 65 Fed. Reg. 67349 (Nov. 6, 2000); President Obama's November 5, 2009, "Memorandum on Tribal Consultation," 74 Fed. Reg. 57881; Interior's "Policy on Consultation with Indian Tribes" (proposed) 76 Fed. Reg. 76 28446-01 (May 17, 2011).

obligation generally.  Interior's Secretarial Order on this topic states in broad terms that its agencies "shall consult with, and seek the participation of, the affected Indian tribes to the maximum extent practicable," and provide "affected tribes adequate opportunities to participate in data collection, consensus seeking, and associated processes."  Sec. Order No. 3206, at 4 (June 5, 1997) (quoted in Doc. 75 at 55) (internal citations omitted).  The questions for the Court are whether this obligation carries with it specific, measurable consultation requirements that have the force of law in the ESA context, and whether FWS failed to meet those requirements in this case.

### A.    Consultation Obligations.

The Tribes cite several cases to show that courts have set aside agency actions taken without proper government-to-government consultation.  As Defendants note, however, the two main cases relied on by the Tribes are not directly on point because they derive the agencies' consultation requirements from federal statutes other than the ESA.  In *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dept. of Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010), the Bureau of Land Management ("BLM") was required to consult with affected tribes under the National Historic Preservation Act ("NHPA") before approving a solar energy project on lands containing 459 identified cultural resources, including archeological sites where the tribe had buried human remains.  *Id.* at 1107-08.  NHPA regulations specified seven issues about which BLM was to consult with the tribe and included a process for the tribe to challenge a BLM decision regarding a cultural or archeological site's National Register eligibility.  *Id.* at 1109.  It was in the context of this detailed regulatory scheme that the court stated that "[t]he consultation requirement is not an empty formality" and set aside the BLM's final decision for side-stepping consultation requirements "imposed by Congressionally-approved statues and duly adopted regulations."  *Id.* at 1108, 1119.

In *California Wilderness Coalition v. U.S. Dept. of Energy*, 631 F.3d 1072 (9th Cir. 2011) ("*CWC*"), the Department of Energy ("DOE") failed to comply with statutory

requirements to consult with the States in developing electrical transmission congestion studies prior to designating "national interest electrical transmission corridors" under the Energy Policy Act of 2005 ("EPAct").   *Id.* at 1081.   *CWC* was based on consultation obligations found in the EPAct.   The ESA does not contain similar consultation requirements.

The remaining cases cited by the Tribes derive their consultation requirements either from the federal government's role as trustee over treaty-protected tribal lands or resources, or from federal law.  For example, *Klamath Tribes v. United States*, 1996 WL 924509 (D. Or. Oct. 2, 1996), dealt with the United States Forest Service's ("USFS") failure to consult with the Klamath Tribes before engaging in eight timber sales from tribal lands in violation of the federal government's trust duty "to avoid adverse effects on treaty resources."   1996 WL 924509 at *8.   *Confederated Tribes and Bands of the Yakama Nation v. U.S. Department of Agriculture*, 2010 WL 3434091 (E.D. Wash. Aug. 30, 2010), dealt with the Department of Agriculture's ("USDA") failure to consult with the Yakama Nation before placing a landfill adjacent to tribal lands where it would interfere with the tribe's treaty-protected hunting, gathering, and fishing rights.  The court found that the duty to consult in that case derived from "the Yakama Treaty of 1855 and federal Indian trust common law."   *Id.* at *4.   The remaining cases all deal with decisions made by the Bureau of Indian Affairs' ("BIA") directly related to administrative issues or services on tribal reservations, including appointments to BIA supervisory positions, changes in education funding, and employment reductions.   *See Ogala Sioux Tribe v. Andrus*, 603 F. 2d 707 (8th Cir.1979); *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774 (D. S.D. 2006); *Lower Brule Sioux Tribe v. Deer*, 911 F.Supp. 395 (D. S.D. 1995).  In each case, the courts found that the BIA had violated consultation requirements clearly established by federal law or by specific BIA policy.

This case impacts tribal interests because the desert eagle population lives, in part, on tribal lands and the desert eagle is an integral part of tribal culture.  DPS listing

decisions made pursuant to the ESA, however, do not implicate the federal government's fiduciary duty over the management of specific treaty-protected resources as did the actions of the USFS and the USDA in *Klamath Tribes* and *Yakama Nation*, nor does FWS have the same statutory and regulatory obligations to consult with the Tribes under the ESA that the BIA has when making decisions directly related to the management of tribal services and employment on Indian Reservations.

For these reasons, the Court cannot conclude that the cases cited by the Tribes establish the consultation standards for an ESA case.  Congress and Interior have not imposed such consultation obligations in the ESA context, and it is not the proper role of the Court to impose such obligations on its own.

**B.     The "Ultimate Decision-Maker" Argument.**

The San Carlos Apache Tribe ("San Carlos") concedes that throughout the status review the FWS "Field Office and Region 2 office made a genuine effort to involve Indian tribes, nations and communities in Arizona . . . and to listen, understand, and synthesize the traditional ecological knowledge provided by the Apache Tribe and others relevant to the DPS policy." Doc. 61 at 28.  San Carlos argues, however, that the status review process was unlawful because San Carlos did not have direct access to FWS Assistant Director Gary Frazer, who made the ultimate DPS decision. *Id.* at 29.  The Salt River Pima-Maricopa Indian Community ("Salt River") makes the same argument. Doc. 58 at 22-23.

The Tribes' argument is based on dictum in *Lower Brule* that "[m]eaningful consultation means tribal consultation in advance with the decision maker or with intermediaries with clear authority to present tribal views to the . . . decision-maker." 911 F. Supp. at 401.  *Lower Brule* itself concerned BIA's "total failure to consult" and therefore did not explain or apply this principle.  *Id.* at 400.  The Tribes cite no other authority for their claim that consultation requires access to the ultimate decision maker,

1   and the Court declines their invitation to fashion a new common law consultation

2   obligation on the basis of dictum in another district court decision.

3          Moreover, even if the Court were to conclude that consultation requires access to

4   the ultimate decision-maker or his or her intermediaries, the Tribes do not dispute that

5   their elected officials met with FWS's Arizona and Regional Staff, including Region 2

6   Director Tuggle, and that Director Tuggle had authority to present tribal views to his

7   superiors.  The record shows that Region 2 staff transmitted draft DPS findings, including

8   tribal information, to the reviewing staff in Washington, D.C., and that staff from both

9   offices worked on preparing a final draft of the 12-month finding.  AR 8345-8423 (see,

10  especially, AR8364-67), AR8859-8941 (see, especially, AR8869-70, 8881-82, 8908,

11  8919-21).  It thus appears the Tribes had access to "intermediaries with clear authority to

12  present tribal views to the . . . decision-maker."  *Lower Brule*, 911 F. Supp. at 401.

13         **C.     Salt River's Other Arguments.**

14         Salt River argues that its sole consultation with the FWS Regional Director on

15  July 20, 2009, was not "timely, meaningful, or [in] good faith."  Doc. 81 at 17.  Salt

16  River asserts that meaningful consultation should begin early and continue throughout the

17  process.  Doc. 58 at 24.  Defendants respond that they initiated contact with the tribes

18  well before the status review started, and shortly thereafter began making plans for

19  consultation with individual tribes.  While the record cited by Salt River reflects this fact,

20  it also reflects that Salt River repeatedly asked for individual consultation and that it

21  objected that a single, multi-tribe meeting did not constitute government-to-government

22  consultation.  The record also shows that despite initiating contact with the tribes in

23  March of 2008, and then meeting with Salt River to discuss the consultation process in

24  May of 2008, FWS did not meet individually with Salt River to discuss the status review

25  until July 20, 2009.  Given Salt River's repeated requests to consult individually and its

26  clear position that a one-day joint-meeting was not sufficient, Defendants' argument that

27

28

1    the meeting in July of 2009 was timely because it was still several months before the end

2    of the by-then extended status review rings hollow.

3         While meeting with Salt River months earlier would undoubtedly have been more

4    meaningful to and respectful of the tribe, the Court cannot conclude that the consultation

5    undertaken by FWS was unlawful.   Salt River cites *CWC* for the principle that

6    "consultation with tribal government should begin early and continue throughout the

7    administrative process."   Doc. 58 at 24 (citing *CWC*, 631 F. 3d at 1087-92).   But this

8    requirement actually comes from the NHPA regulations in *Quechan* which state that

9    "[c]onsultation should commence early in the planning process, in order to identify and

10   discuss relevant preservation issues and resolve concerns about the confidentiality of

11   information on historic properties."   755 F. Supp. 2d at 1109 (citing 36 C.F.R.

12   § 800.2(c)(2)(ii)(A)).   No similar regulations apply here.

13        Salt River's cases are also distinguishable.   In *Quechan*, the BLM never sent

14   letters inviting the tribe to consult, and it did not meet with the tribe to discuss sensitive

15   sites in the relevant project area until after the solar project had been approved.   *Id.* at

16   1118.   *Lower Brule* involved the BIA's "total failure to consult."   911 F. Supp. at 401.

17   *Lower Brule* also found that the BIA had met its consultation duties in the past with one

18   or two hour meetings with tribal councils.   *Id.*

19        Salt River argues that FWS denied it the chance to review and comment on FWS

20   draft documents "despite the lack of any law or regulation that prohibits such

21   collaboration."   Doc. 58 at 24.   But the relevant question is not whether the law prohibits

22   such collaboration, but whether the law requires it.   In *CWC*, which Salt River cites for

23   this proposition, the DOE was required to collaborate by Congress.   631 F. 3d. 1072 at

24   1080.   Congress specifically intended that states participate in the EPAct process because

25   DOE's determinations could infringe the state's traditional powers.   *Id.* at 1087.   The

26   relevant standards for federal state cooperation in the EPAct context simply do not apply

27

28

to the ESA, and the Court will not import them into some kind of common law requirement when neither Congress nor Interior has seen fit to impose them on FWS.

It is also in the context of *CWC* that Salt River makes the argument that FWS did not provide Salt River with the data upon which the final decision was based. Doc. 81 at 10. In *CWC*, the DOE failed to give the states modeling data that was essential to their ability to evaluate the agency's energy congestion study, an act that kept the states from being able to provide "informed criticism and comments." 631 F. 3d at 1072. Salt River acknowledges that in 2008 FWS gave it CDs containing most of the information FWS ultimately relied on. Doc. 81 at 10. Salt River argues that because FWS ultimately revised its draft DPS finding in 2009, it must have withheld information actually relied upon, but Salt River does not support this assertion by reference to any information in the administrative record.

Salt River argues that it never had the chance to comment on FWS's revised negative DPS finding before FWS published it in early 2010. *Id.* at 10-11. Salt River cites no basis for the claim that FWS had a legal obligation to give the tribes a chance to comment before releasing a final agency determination.

In sum, Salt River has failed to identify specific legal standards that apply to FWS and that have been violated in this case. The Court therefore cannot accept its consultation argument.

**VII.   Remedy.**

The Court will enter summary judgment in favor of Plaintiffs on their claim that the 12-month finding was procedurally flawed. As a remedy, Plaintiffs ask the Court to remand the 12-month finding to DPS. Doc. 64 at 41. The Court will do so.

Plaintiffs also ask the Court to enjoin DPS from applying the 2007 delisting rule to the desert eagle until the 12-month finding has been revised on remand. *Id.* Defendants seek an opportunity to brief the propriety of injunctive relief before the Court imposes

such a remedy.  Doc. 75 at 57 n. 29.  The Court will establish a short briefing schedule and resolve the issue of injunctive relief in the next several weeks.

**IT IS ORDERED:**

1.     Plaintiff's motions for summary judgment (Docs. 57, 61, 63) are **granted** to the extent they assert that FWS's desert eagle 12-month finding is procedurally flawed. The motions are denied in all other respects.

2.     Defendants' cross-motion for summary judgment (Doc. 73) is **denied**.

3.     The 12-month finding is remanded to FWS for reconsideration consistent with this order.  FWS shall produce a new 12-month finding by **April 20, 2012**.  The 12-month finding may be based on information gathered during the status review already conducted, and should address the issues identified in this order.

4.     Plaintiffs and Plaintiff-Intervenors shall, by **May 4, 2012**, file brief memoranda (no longer than 7 pages each) stating their positions with respect to the new 12-month finding and their views on whether additional action is necessary in this litigation.  The Court will then convene a conference call with the parties to discuss the future course, if any, of this litigation.

5.     The parties shall, by **December 16, 2011**, submit simultaneous memoranda, not to exceed 10 pages each, on Plaintiffs' request that the Court enjoin DPS from applying the 2007 delisting rule to the desert eagle until the 12-month finding has been revised on remand.

6.     The motion for leave to file a brief amicus curiae by the Pacific Legal Foundation (Doc. 72) is **granted.**

Dated this 30th day of November, 2011.

David G. Campbell
United States District Judge