**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity and Maricopa Audubon Society,<br><br>Plaintiffs,<br><br>and<br><br>San Carlos Apache Tribe, a federally recognized Indian tribe, and Salt River Pima-Maricopa Indian Community, a federally recognized Indian tribe,<br><br>Plaintiff-Intervenors,<br><br>v.<br><br>Kenneth Salazar, in his official capacity as Secretary of the United States Department of the Interior, and Daniel Ashe, in his official capacity as Director of the United States Fish and Wildlife Service,,<br><br>Defendants. | No. CV10-2130-PHX-DGC<br><br>**ORDER** |

On November 30, 2011, the Court ordered the parties to submit memoranda regarding Plaintiffs' request that the Court enjoin the Fish and Wildlife Service ("FWS") from applying its 2007 delisting rule to the desert eagle until it completes revision of its 12-month finding on the desert eagle's status as a distinct population segment ("DPS") of bald eagles. Doc. 88 at 23. Plaintiffs Center for Biological Diversity ("the Center") and Maricopa Audubon Society, and Plaintiff-Intervenor San Carlos Apache Tribe ("San Carlos"), have submitted memoranda in support of injunctive relief.  Docs. 90, 92.

Defendants have submitted a memorandum in opposition to injunctive relief. Doc. 91. For the reasons stated below, the Court will deny Plaintiffs' request.[1]

**I.  Background.**

The bald eagle was listed as a threatened species under the Endangered Species Act ("ESA") until July 9, 2007, when FWS determined that the bald eagle population had sufficiently recovered to no longer need ESA protections. 72 Fed. Reg. 37346, 37346 (July 9, 2007). In 2004, as FWS was considering removing the bald eagle from the threatened species list, the Center filed a petition asking that FWS list desert eagles separately as a DPS. FWS denied the petition, and the Center filed suit. *See Ctr. for Biological Diversity v. Kempthorne*, No. CV 07-0038-PHX-MHM, 2008 WL 659822 (D. Ariz. March 6, 2008). Judge Mary H. Murguia set aside FWS's denial of the Center's petition as arbitrary and capricious and ordered FWS to conduct a 12-month status review. 2008 WL 659822, at *16. Judge Murguia also enjoined the application of the 2007 delisting rule to the desert eagle population until FWS completed its DPS determination. *Id.* at *15, *16.

To comply with the court's injunction, FWS published a final listing rule on May 1, 2008, listing the desert eagle as threatened under the ESA. 73 Fed. Reg. 23966 (May 1, 2008). FWS also completed its status review and published its 12-month finding in the Federal Register on February 19, 2010, finding that the desert eagle was "discrete" but not "significant" to the species as a whole and therefore not entitled to DPS treatment. *See* 12-Month Finding on a Petition to List the Sonoran Desert Population of the Bald Eagle as a Threatened or Endangered Distinct Population Segment, 75 Fed. Reg. 8,601 (Feb. 25, 2010). FWS filed a motion to have the injunction against applying the 2007 delisting rule to the desert eagle lifted, and on September 30, 2010, Judge Murguia lifted the injunction. *See Ctr. for Biological Diversity v. Salazar*, No. CV 07-0038-PHX-

---

[1] The request for oral argument is denied. The issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

MHM, 2010 WL 3924069, at *4 (D. Ariz. Sept. 30, 2010). On September 2, 2011, FWS issued a rule removing the desert eagle from the federal list of endangered and threatened wildlife, effective from the time of Judge Murguia's order lifting the injunction. *See* Bald Eagles Nesting in Sonoran Desert Area of Central Arizona Removed From the List of Endangered and Threatened Wildlife, 76 Fed. Reg. 54711, 54711 (Sept. 2, 2011).

Following FWS's completion of its court-ordered status review, the Center again filed suit, arguing that the 12-month finding was arbitrary and capricious. The Center asked the Court to remand the 12-month finding and again to enjoin FWS from applying the 2007 delisting rule to the desert eagle until its finding is revised on remand. On November 30, 2011, the Court granted summary judgment to Plaintiffs on the claim that FWS's 12-month finding was procedurally flawed. Doc. 88 at 23. The Court also remanded the 12-month finding to FWS and ordered that FWS complete a new 12-month finding by April 20, 2012. *Id.* The Court asked the parties to brief the propriety of injunctive relief.

**II.   Legal Standard.**

An injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). A Plaintiff seeking a permanent injunction must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L. C.*, 547 U.S. 388, 391 (2006). The Ninth Circuit has applied this test in the environmental context. *See California ex rel. Lockyer v. USDA*, 575 f. 3d 999, 1019-20 (9th Cir. 2009) (citing cases). Under the ESA, the third and fourth factors – the balance of the hardships and the public interests – tip in favor of protecting the endangered species. *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987). Nonetheless, all four factors must be

satisfied. *See, e.g., Winter*, 555 U.S. at 20; *Defenders of Wildlife v. Salazar*, -- F. Supp. 2d --, 2009 WL 8162144, Nos. CV 09-77-M-DWM, CV 09-82-M-DWM (D. Mont. Sept. 8, 2009), at *2 (noting that the weighting of the third and fourth factors in favor of the species does not eliminate the need for a Plaintiff to show all four factors).

**III.   Discussion.**

Plaintiffs ask the Court to vacate FWS's September 2, 2011 rule removing the desert eagle from the federal list of endangered species, pending a final listing of the desert eagle as threatened or endangered, and to vacate FWS's finding in the 2007 delisting rule that desert eagles are not "significant."  Doc. 92 at 2-3.

**A.    Vacating of FWS's September 2, 2011 Delisting.**

Before undertaking the four-part analysis to determine whether an injunction is warranted, the Court will address the scope of the injunction sought in Plaintiffs' memoranda.  In its motion for summary judgment, Plaintiffs requested an injunction "while FWS completes a new status review on remand."  Doc. 64 at 41.  Now, Plaintiffs note that a positive DPS finding would only place desert eagles on a candidate list for ESA listing – potentially for six years or more – pending adequate funding and the implementation of higher priority listings.  Doc. 92 at 2 (citing AR 008769).  Plaintiffs ask the Court to issue an injunction to last until either the desert eagle is actually listed or until this litigation is resolved by joint agreement of the parties.  *Id.* at 2-3.

Plaintiffs ask the Court to do more than return the desert eagle to the status quo that would have existed if FWS had conducted a lawful status review following its initial petition.  Plaintiffs would have the Court return the desert eagle to the protected status it had prior to the 2007 delisting rule when bald eagles, in general, were listed as threatened.  That status is no longer possible because bald eagles are no longer listed as threatened and no one has challenged the 2007 delisting rule.  In her prior ruling, Judge Murguia stated that she did not take issue with the 2007 delisting rule; she concluded only that if FWS had properly considered the Center's listing petition, it would have had

to determine the status of the desert eagle separately from that of the entire bald eagle population. *Kempthorne*, 2008 WL 659822, at *14.  Judge Murguia's injunction, though intended to retain the protections that existed for the desert eagle prior to the 2007 delisting rule, was to have effect only "until FWS makes a lawful determination of [the desert eagles'] status as a DPS." *Id.*  The Court declines to extend the injunction period beyond the time required for FWS to make this determination.  Thus, the Court will consider the current request for an injunction to extend through the April 20, 2012, the deadline for FWS to comply with the Court's remand.

### 1. Irreparable Harm.

To warrant injunctive relief, a Plaintiff must demonstrate the "likelihood," not merely the "possibility," of irreparable harm. *Winter*, 555 U.S. at 22; *see also National Wildlife Fed. v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1512 (9th Cir. 1994) ("While we do not require that future harm be shown with certainty before an injunction may issue, we do require that a future injury be sufficiently *likely.*") (emphasis in original).  The Ninth Circuit has stated that "[a] reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction" *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996); *see also Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 786.  (9th Cir. 1995).

Plaintiffs argue that, absent an injunction, the desert eagle will be without the substantive and procedural protections of section 7 of the ESA intended to safeguard a protected species and its habitat from harm.  Doc. 92 at 9.  Section 7 requires federal agencies to consult with FWS before undertaking any actions – including those authorized, funded, or carried out by the agency – that may impact an endangered or threatened species, and to ensure that its actions do not jeopardize the continued existence of the species.  16 U.S.C. § 1536(a).  ESA regulations set forth detailed requirements for these consultations.  *See* 50 C.F.R. § 402.  Plaintiffs also note that section 9 of the ESA, which prohibits the incidental "take" of a protected species from otherwise legal activities

and allows for citizen suits as a means of enforcement, would apply to the desert eagle if listed as threatened.  Doc. 92 at 4-5, 4, n. 1; *see* 16 U.S.C. § 1538(a).  Plaintiffs acknowledge that the desert eagle is currently protected under the Bald and Golden Eagle Protection Act ("BGEPA") and the Migratory Bird Treaty Act ("MBTA"), but Plaintiffs note that these acts do not contain provisions for citizen suits and offer only limited protections to habitat.  Doc. 92 at 4-5.

Plaintiffs argue that without ESA protections, the desert eagle would be subject to "extensive ongoing and future harm" as catalogued by FWS's Arizona biologists in their draft "threats assessments" during the previous 12-month desert eagle status review.  Doc. 92 at 7-8.  Plaintiffs also argue that, absent an injunction, revisions currently underway for all but one of Arizona's national forests' land and resource management plans would be carried out without regard to section 7's consultation requirements, allowing for potentially harmful actions that directly affect desert eagles and their habitat.  *Id.* at 10 (citing Doc. 93, Decl. of Robin Silver, ¶¶ 12-13).  San Carlos joins in Plaintiffs' motion and additionally points to the danger posed to desert eagles from wind energy production.  Doc. 90 at 1, 5-6.

### a. FWS's Draft "Threats Assessments."

Plaintiffs pin-point a number of potential threats to the desert eagle and its habitat identified by FWS's Arizona Biologists, including (1) increased pumping from the Big Chino aquifer due to a planned housing development in Chino Valley, and plans by Prescott and Prescott Valley that include new development and increased pumping, potentially dewatering desert eagle breeding areas along the Verde River, (2) potential plans by the state of New Mexico to use federal funds for the development of a water project that would divert flow from the Gila River system, (3) potential loss of funding for the Arizona Bald Eagle Nest Watch Program, partially provided for by section 7 mitigation measures, and (4) additional activities such as grazing and recreational activities on federal lands and the federal operation of reservoirs.  Doc. 92 at 7-9 (citing

AR 006368-006371, 006372-006373, 006383-006384, Decl. of Robin Silver, Doc. 93, ¶¶ 17-21).  The question for the Court is whether any of these activities pose a likely threat of irreversible harm if desert eagles are not listed between now and April 20, 2012.

### (1)     Chino Valley Water Projects.

Plaintiffs argue that a large proposed housing development in Chino Valley could contribute to the dewatering of desert eagle nesting areas along the Verde River and that because the development depends upon a land-swap between private developers and the U.S. Forest Service, this development would be subject to section 7 consultation requirements as long as the listing of desert eagles is in effect.  Doc. 92 at 8.  But the text and comments included in the draft threat assessment present ambiguity about the time frame for the proposed land swap and the subsequent development of the Yavapai Ranch project, with the time frame for completion of the project unknown.  AR 006370.  The comments indicate that the actual housing development could move forward slowly due to economic conditions, but that the parties involved in the land exchange were "at the table" and ready to move forward.  *Id.*  Plaintiffs provide no updated information on the status of the potential land exchange, which was subject to section 7 consultation requirements at the time of the draft threat assessments.  *Id.*  It is unclear, therefore, whether the proposed land exchange took place subject to section 7 consultations or is still pending and could be executed between now and April 20, 2012.

The likelihood of harm from this proposed development is also unknown and is dependent on the cumulative effect of other proposed projects that are also speculative. The threat assessment indicates that at full-build the project could result in the pumping of 1,039 acre feet of water in addition to the last calculated average use of 11,840 acre feet, offset by a total recharge amount of 21,500 acre feet.  *Id.*  The assessment also states that pumping from this development, combined with other proposed projects by Prescott and Prescott Valley, "should they occur," would exceed the total re-charge amount and would likely result in dewatering of portions of the upper Verde River, impacting three

existing desert eagle breeding areas. *Id.* at 006370-71.

Defendants state, however, that "there are significant hurdles associated with future pumping of the Big Chino aquifer by the communities associated with the City of Prescott." Doc. 91-1, Decl. of Steven L. Spangle, ¶ 31. In particular, the Prescott area pipeline project faces challenges such as "1) acquiring rights-of-way for pipelines across private land; 2) building 20-30 miles of pipeline; 3) generating the funds and paying for this work, estimated between 100-200 million dollars; and 4) establishing agreement and monitoring plans with [Salt River Project]." *Id.* Based on its own participation in the project and its conversations with SRP, FWS estimates that these actions will take several years to complete and that impact from groundwater pumping in the Big Chino aquifer region "is unlikely to occur during the timeframe of this litigation." *Id.* A settlement agreement between SRP and the City of Prescott also includes measures to mitigate negative effects to water flow on the upper Verde River, should they occur, leaving the future impact of this development unknown. *Id.*

Although Plaintiffs have identified the possibility that future development could result in decreased water flow on the Upper Verde River that would impact three desert eagle breeding areas, the Court finds that Plaintiffs have not shown the likelihood of irreparable harm absent ESA protections during the remand period.

### (2) New Mexico Water Project.

Plaintiffs argue that federal funding to the state of New Mexico for the implementation of water projects could be used to divert 14,000 acre feet of water annually from the Gila River system, impeding the growth of vegetation, threatening native fish and birds, and reducing the productivity of three desert eagle nesting areas. Doc. 92 at 8 (citing AR 006372-73). Plaintiffs argue that federal funding would trigger section 7 protections if the desert eagle is listed. *Id.*

As with the Chino Valley developments, the Court finds that the time frame and ultimate impact of New Mexico's potential use of federal funds for water projects is

unclear. FWS's draft threats assessments indicate that New Mexico has until December, 2014, to notify the Secretary of the Interior if it chooses to use the federal funds for water projects. AR 006372. The particular project Plaintiffs cite is a proposal of the New Mexico Interstate Stream Commission which FWS concluded could negatively impact the desert eagle population. *Id.* at 006372-73. FWS also stated, however, that "details for the diversion project are still under development, so the impact of this project on aquatic resources cannot yet be evaluated." *Id.* at 006373. Without updated information about the status of this proposal, the Court cannot conclude that harm to the desert eagle is reasonably certain to occur absent section 7 consultation during the remand period.

### (3) Arizona Bald Eagle Nestwatch Program.

Plaintiffs argue that funding for the Arizona Bald Eagle Nestwatch Program could face shortages if the desert eagle is not given ESA listing protections. Doc. 92 at 8 (citing AR 006383-84). In its draft threats assessments, FWS noted the importance of the Nestwatch program, which helped rescue and return to the wild 49 nestlings and eggs between 1983 and 2005, representing 9.4% of fledgling eagles in Arizona. AR 006383. FWS expressed concern that funding for the program, which comes from a variety of sources, including federal money spent in fulfillment of section 7, could diminish as a result of delisting because funding agencies might give bald eagles less priority than other species. *Id.* at 006383-84. Defendants point out, however, that adequate funding for the Nestwatch program has been committed through 2012. Doc. 91-4, Decl. of James Driscoll, ¶ 17, Exh. 1. Any potential harm from lack of funding to this program is therefore not likely to occur during the remand period.

### (4) Other Activities on Federal Land.

Plaintiffs put forth other potential harms, including the grazing of livestock that FWS noted "remains a concern" in a few areas along the Lower Verde River where desert eagles breed. Doc. 93, Decl. of Robin Silver, ¶ 17 (citing AR 006377). Plaintiffs point out that the Granite Reef breeding area, in particular, is located, in part, on U.S.

Forest Service Land. *Id.* (citing AR 006387, L001893). Plaintiffs argue that ESA listing of the desert eagle would require the Forest Service to follow section 7's substantive and procedural requirements when making decisions regarding the management of grazing on these lands as well as require the Forest Service to minimize incidental "take" of desert eagles from grazing activities. *Id.* Other than reiterating FWS general concerns, however, Plaintiffs have not identified any harm likely to occur from impending Forest Service decisions; nor have they shown any risk of incidental "take" from grazing activities. Additionally, although FWS identified the Granite Reef breeding area as one of six areas where grazing adds stress to the ecosystem, the declaration of FWS Arizona Field Supervisor, Steven L. Spangle, points to many protective measures already in place and clarifies that grazing on the Lower Verde River does not currently take place on Forest Service lands. Doc. 91-1, Decl. of Steven L. Spangle, ¶¶ 15-19, 17.

Plaintiffs also point to FWS's concerns, including potential habitat loss, related to increased recreational activities and proposed facility developments along major rivers and lakes, some on federal lands. Docs. 92 at 8-9, 93 at 6, Decl. of Robin Silver, ¶ 18 (citing AR 006378-79). Notwithstanding these general concerns, Plaintiffs point to no specific impending federal actions (potentially subject to section 7 protections) or non-federal actions involving the incidental "take" of desert eagles (potentially subject to section 9 protections) likely to cause irreparable harm during the remand period.

The Court has also reviewed Plaintiffs' concerns that the federal management of reservoirs could lead to decisions that would jeopardize the continued existence of desert eagles (Doc. 93 at 6, Decl. of Robin Silver, ¶ 19 (citing AR 006374-76)) and has similarly concluded that FWS's draft threats assessment, upon which Plaintiffs' rely, does not point to any specific activities or decisions over the remand period that would likely cause irreparable harm to the desert eagle population. See AR 006376 (concluding that "the alteration of river systems have both negatively and positively affect[ed] bald eagles in the Sonoran Desert area. The future of these projects is unknown, but we know

of no large-scale project that will impact bald eagles"). Defendants also note that even without ESA listing, SRP's operation of dams in the Sonoran Desert area is subject to "take" permits under the BGEPA, each requiring detailed Habitat Conservation Plans that will remain in effect long beyond the time-frame for remand. *See* Doc. 91-1, Decl. of Steven L. Spangle, ¶¶ 20-35 (detailing SRP's agreed-upon measures to protect desert eagles and their habitat in its use of dams and reservoirs).

### b.   National Forest Plans.

Plaintiffs note that the U.S. Forest Service is in the process of revising its Land and Resources Management Plans ("LRMPs") for all but one of Arizona's national forests and that, without ESA listing, these plans will proceed without section 7 consultation. Doc. 92 at 9-10. Plaintiffs state generally that the LRMPs "establish parameters for activities that can harm Desert Eagle habitat, including whether, where, and to what extent activities such as grazing, off-road vehicle use, and recreation activities will occur on a national forest," and they guide many site-specific management decisions involving these activities. Doc. 93, Decl. of Robin Silver, ¶ 11. Plaintiffs do not cite any particular plans involving the Sonoran Desert area that would pose a likely threat of irreparable harm to the desert eagle if made without section 7 consultation during the remand period.[2]

Plaintiffs also argue that the implementation of current LRMPs will adversely affect the desert eagle absent ESA protections. Doc. 93, Decl. of Robin Silver, ¶ 15. Plaintiffs note, in particular, that the Coconino National Forest allows for the development of campsites and off road vehicle use in areas known to contain nesting bald eagles. *Id.* at ¶ 16. Plaintiffs do not cite specific plans by the Coconino National Forest

---

[2] Even recognizing that LRMPs can have long-term effects, *Pacific Rivers Council v. Thomas* – which Plaintiffs cite to show that the development of LRMP's is subject to section 7 consultation requirements – rejected the argument that such plans are only subject to section 7 consultation at the time they are adopted, revised, or amended. 30 F.3d 1050, 1055 (9th Cir. 1994). Consequently, whatever plans the national forests adopt during the remand period will be subject to revision if and when the desert eagle is listed as a DPS. See *id.* at 1056.

to develop any of these areas, however, and Defendants argue that the only three sites in the Coconino National Forest to contain bald eagle nests within the Sonoran Desert area "are located in remote sections of the Verde River where recreational activity is limited, human access is difficult, and current management is believed to be appropriate." Doc. 91-1, Decl. of Steven L. Spangle, ¶ 36.  Plaintiffs also cite to a 2005 biological opinion predicting that recreation and grazing in the Tonto National Forest is likely to result in the "take" of eagles, but Plaintiffs have not shown that this has occurred or that it is reasonably likely to occur under current management policies absent ESA protections between now and April 20, 2012.  *See* Doc. 93, Decl. of Robin Silver, ¶ 16.

### c. San Carlos' Motion.

San Carlos initially calls into question FWS's finding that bald eagle breeding areas have increased in Arizona since 1971, stating that the Apaches have documented a longstanding decline of desert eagles and their habitat over the past 150 years.  Doc. 90 at 2-3.  The Court need not decide whether the Arizona desert eagle population has declined from its historic levels, nor whether the desert eagle warrants DPS protection.  In its prior order, the Court stated that it expresses no view on the correct outcome of FWS's finding on remand.  Doc. 88 at 14.  The narrow question for the Court is whether the desert eagle faces a likely threat of irreparable harm if not given ESA listing protections during remand.

In addition to the potential threats already discussed, San Carlos argues that wind energy poses a serious threat to desert eagles absent ESA protections.  Doc. 90 at 6.  San Carlos cites to a news report on the development of Arizona's first wind energy farm in October, 2009.   Doc. 90 at 13 (*see*  http://www.businessweek.com/ap/financialnews/ D9JSH45O0.htm).  San Carlos does not claim that the Dry Lake Wind Farm, located northwest of Snowflake, is in the Sonoran Desert.  *See id.*  San Carlos also cites to a petition for rulemaking by the American Bird Conservancy detailing the threat of wind turbines to migratory birds, including eagles.  Doc. 90 at 13 (*see* http://www.abcbirds.org/abcprograms

/policy/collisions/pdf/wind_rulemaking_petition.pdf.).  San Carlos does not identify any particular wind energy project located within the habitat of the desert eagle or likely to be developed in the Sonoran Desert area.  According to the declaration of Brian Millsap, National Raptor Coordinator for FWS, there are currently "no approved projects or pending Bald Eagle permit requests [under the BGEPA] for wind development in the geographical area of the Sonoran Desert where bald eagles nest or where juvenile bald eagles from those nests might fly during migration," and wind farms are not generally developed in uneven riparian habitats where bald eagles live or fly in great frequency.  Doc. 91-3, Decl. of Brian Millsap, ¶ 21.  Additionally, as the American Bird Conservancy's petition notes, MBTA protections – which apply to desert eagles – prohibit the "take" of bald eagles by wind power projects.  The Court finds no evidence that wind energy poses an imminent threat of irreparable harm to the desert eagle population.

### d.   Conclusion.

Although Plaintiffs have noted a number of possible harms from development projects, water use, and energy projects, Plaintiffs have not shown that the desert eagle is likely to suffer irreparable harm from any of these sources absent ESA protections during the remand period.  Because the Court finds an insufficient showing of likely irreparable harm, the Court need not address the other factors required for an injunction.

### B.   The 2007 Delisting Rule.

Plaintiffs ask the Court to vacate the finding in the 2007 delisting rule that the desert eagle is not "significant" in order to foreclose FWS from consideration of or reliance upon that finding on remand.  Doc. 92 at 3.  The Court has already made rulings that address this concern.  In its prior order, the Court stated that the 2007 delisting rule was not a valid status review for purposes of the desert eagle DPS petition.  Doc. 88 at 14.  The Court also stated that FWS's finding on remand must be "based on information gathered and consultations completed during the status review conducted in response to Judge Murguia's order" and not on the findings in its 2007 rule "reached without appropriate notice,

comment, and consultation." *Id.* at 15, 14.  Moreover, the 2007 delisting rule has not been challenged in case, and the Court will deny Plaintiff's request to vacate that rule's finding as beyond the scope of this litigation.

**IT IS ORDERED:**

1. Plaintiffs' request that the Court vacate FWS's September 2, 2011 rule (Doc. 92) removing the desert eagle from the federal list of endangered species is **denied**.

2. Plaintiff's request that the Court vacate FWS's finding in the 2007 delisting rule that desert eagles are not "significant" (Doc. 92) is **denied**.

Dated this 11th day of January, 2012.

_____
David G. Campbell
United States District Judge